**IN THE UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                No. CR 10-2309 LH

FORTUNATO BELTRAN-LOPEZ,

       Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Fortunato Beltran-Lopez's Motion to Suppress and Memorandum in Support Thereof (Doc. 28).  Defendant argues that evidence seized from 3301 Monroe N.E., Unit B-13, Albuquerque, ("the Monroe apartment") must be suppressed because the initial warrantless entry into the apartment to secure it while officers obtained a search warrant was not supported by exigent circumstances and the subsequently obtained search warrant lacked probable cause to issue.  This Court, in an Amended Memorandum Opinion and Order (Doc. 47), filed on December 6, 2010, denied Defendant's request for a *Franks* hearing and determined that the search warrant did not lack probable cause and that the good-faith exception would apply in any event.  The Court held a hearing on December 7, 2010, on the remaining issue as to whether exigent circumstances were present to justify entry into the apartment to secure it pending issuance of the search warrant.  The Court, after considering the motion, briefs, evidence, and applicable law, concludes that Defendant's motion to suppress should be granted as to the evidence of the agents' observation of Defendant retreating into the home and attempting to destroy evidence in the bathroom, but denied as to all other evidence, including the money remitter receipts.

## I.   FACTUAL FINDINGS

Federal Rule of Criminal Procedure 12(d) requires the Court to state its essential findings on the record when deciding a pretrial motion that involves factual issues.  The Court finds that the testimonies of Drug Enforcement Administration ("DEA") Special Agent ("SA") Jarrell Perry and SA David Howell were credible concerning the facts relevant to this motion.  The Court makes the following additional findings of fact.

On July 20, 2010, SA Christopher Scott Godier obtained a federal search warrant for the home located at 3227 Moab Lane NE ("the Moab home").  Agents executed the warrant on July 21, 2010, at approximately 11:30 a.m.  During their search, agents found methamphetamine and heroin in a hidden compartment in a teal colored Nissan sedan that was parked in the garage of the Moab home.  Immediately after agents found the drugs at the Moab home, shortly after 11:30 a.m., they decided to prepare a search warrant for the residence at the Monroe apartment.[1]

Prior to executing the search warrant at the Moab apartment, at around 10:00 a.m. on July 21, 2010, a Nissan Sentra backed out of the Moab home's garage.  SA Howell followed the Sentra from the Moab home to the Monroe apartment, a distance of between three and six miles.  SA Howell was the only vehicle following the Sentra, so in order not to lose it, he followed it close enough to make all the traffic lights.  Given the distance traveled and the surveillance method employed, SA Howell felt there was the potential that the driver could have detected his surveillance.  Had he been detected, SA Howell was concerned that the suspect might become more cautious and change his behavior accordingly.  SA Howell, however, never witnessed the driver

---

[1]The facts supporting probable cause for the agents' decision to obtain a search warrant for the Monroe home are fully set forth in the Court's Amended Memorandum Opinion and Order (Doc. 47), and the Court will not reiterate them here.

make any evasive maneuvers to suggest that the driver had indeed observed the surveillance. Rather, the Sentra followed a direct route from the Moab home to the Monroe apartment.

SA Howell followed the Sentra to the Monroe apartment and observed it park in front of the apartment. The Hispanic male driver, later identified as co-Defendant Manuel Gambino-Zavala, got out and went into the Monroe apartment. SA Howell remained in his vehicle, parked in front of the Monroe apartment, and maintained surveillance of the front of the apartment. He again was concerned about the potential the suspects might detect the surveillance because he was still in the same vehicle that had followed the Sentra from the Moab home.

SA Perry assisted the agents on surveillance on July 21, 2010. SA Perry met SA Howell at the Monroe apartments at around 10:15 a.m. SA Perry was in plainclothes and an unmarked police vehicle. SA Perry parked in the parking area behind the Monroe apartment and watched the Monroe apartment and parking space 13, the assigned parking space for the home, for any activity.

The back of the Monroe apartment was surrounded by a high wooden fence. The wooden gate to the fence was latched from the inside of the fence. The slats of the wooden fence and wooden gate were close together, such that a passer-by's view of the interior of the backyard would be obstructed. The Monroe apartment had a sliding glass door to the backyard. A metal iron gate separated the sliding glass door and small porch area from the rest of the backyard. The parking area behind the Monroe apartment was elevated in relation to the Monroe home's backyard, so SA Perry could see over the fence and into a portion of the backyard from his vantage point.

At approximately 10:15 a.m., a Nissan Frontier was parked near the fence. SA Perry could barely see the tan roof of the Nissan Frontier from his location. At some point, the Nissan Frontier left, but agents did not see it leave. SA Perry at some point also left the scene. SA Perry returned to the scene at around 12:30 p.m. and set up in the same location, at which time the Nissan Frontier

3

was back in its parking space.

At approximately 12:55 p.m., agents made the decision to secure the Monroe apartment while they were in the process of obtaining the search warrant for the residence.  SA Godier's preparation of that search warrant began prior to their entry of the Monroe apartment and backyard.

At around 1:10 p.m., SA Perry observed two men at the iron gate in the backyard of the Monroe apartment.  SA Perry could not see the glass door at the time.  He saw the men from approximately their waists and chests up.  One of the men, later identified as Mr. Gambino-Zavala, walked out of the gate to the Nissan Frontier.  Mr. Gambino-Zavala opened the door to the Nissan Frontier, leaned into the vehicle, and then shut the door.  Mr. Gambino-Zavala returned to the area of the glass door and for a few seconds met with the other man, who SA Perry could not identify at the time but who was later identified as Defendant Beltran-Lopez when he was subsequently found in the apartment.  At that point, SA Perry did not feel, based on the suspects' conduct, that any of the agents' presence had been compromised.  Mr. Gambino-Zavala then got into the Nissan Frontier and drove away from the apartment complex.  Defendant Beltran-Lopez went back inside the apartment.  Up to this point, the Monroe apartment and suspects appeared calm.

Agents stationed behind the Monroe apartment, including SA Perry, were instructed to follow the Nissan Frontier.  Agents advised Bernalillo County Sheriff's Office ("BCSO") deputies to stop the Frontier.  BCSO deputies then stopped the Frontier on San Mateo Boulevard near Candelaria and arrested Mr. Gambino-Zavala.  The location of the stop was away from the line of sight of the Monroe apartments.  SA Perry arrived after Mr. Gambino-Zavala had been detained in handcuffs.

SA Howell was in contact with the agents making the stop.  At this point in the investigation, agents were focused on only two men, Mr. Gambino-Zavala and Defendant Beltran-Lopez.  Agents

had secured Mr. Gambino-Zavala, who was subsequently taken to SA Howell's vehicle, and Defendant Beltran-Lopez remained in the Monroe apartment. SA Howell also was in contact with SA Godier who was working on the search warrant affidavit.

SA Perry and about six or seven other agents then returned to the park across from the Monroe apartment where they got into a van and drove to the west side of the apartments. They went to the back of the apartment because that is where they saw Defendant and Mr. Gambino-Zavala earlier.

At around 1:40 p.m., agents secured the Monroe apartment. Their directive was to go up to the apartment to conduct a "knock and talk" or to secure the apartment by force. Agents were specifically instructed not to conduct a search of the apartment until they obtained the warrant, only to detain the individual inside the apartment.

Agents, including SA Perry, and BCSO deputies exited the van and approached the wooden gate to the backyard of the Monroe apartment. They approached in a line along the wooden fence. BCSO deputies had on vests. One of the BCSO deputies unlatched the wooden gate. The agents and deputies entered through the wooden gate into the backyard. After SA Perry entered through the gate and while he was standing in the backyard, SA Perry observed through the partially open blinds Defendant standing inside the sliding glass door. Defendant saw the officers and turned and ran further inside the apartment.

The iron gate was closed. Agents yelled "Police" in English and Spanish when inside the wooden gate but outside the iron gate. SA Perry heard thumping noises, like feet moving, from inside the Monroe apartment. Defendant did not return to the sliding glass door. Because the wrought iron gate was closed, a BCSO deputy pried it open with a tool, which he then used to shatter the glass door.

5

Agents and deputies entered the Monroe apartment.  They heard a toilet flushing.  The door was closed to the bathroom.  Agents opened the door and a BCSO deputy secured Defendant, who was at the toilet, with handcuffs and removed him from the bathroom.  SA Perry saw papers in the bathroom.  Another officer at the scene said that Defendant had been trying to flush money remitter receipts down the toilet.  Agents did not conduct a search of the apartment at that time.  After agents secured Defendant, Mr. Gambino-Zavala was brought back to the Monroe apartment.  Defendant was seated on the living room couch while agents waited for the search warrant.

The magistrate judge approved the search warrant at 2:05 p.m., within 30 minutes of agents securing the apartment.  Only after the warrant was signed did agents begin to search the apartment.

During the search of the apartment, SA Howell took photographs of the apartment, including photographs of the money remitter receipts.  He remembers that the receipts were torn but not wet. SA Howell photographed the receipts outside the bathroom.  He has no knowledge that anything was taken from the bathroom prior to the search conducted after the warrant was obtained.

II.     ANALYSIS

A.     Curtilage

The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ."  U.S. Const., amend. IV.    Physical entry of the home is the chief evil against which the Fourth Amendment is directed.  *Wilson v. Layne*, 526 U.S. 603, 610 (1999) (quoting *United States v. United States Dist. Court for Eastern Dist. of Mich.*, 407 U.S. 297, 313 (1972)).

A warrantless search is unconstitutional if the defendant has a legitimate expectation of privacy in the area to be searched.  *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998).

6

A defendant has a legitimate expectation of privacy in both the home and the curtilage of the home. *Oliver v. United States*, 466 U.S. 170, 180 (1984).  The curtilage is defined as "the area to which extends the intimate activity associated with the 'sanctity of a man's home and the privacies of life.'" *Id.* (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).  The protections afforded by the Fourth Amendment, however, do not extend to the open fields.  *Id.* at 179-80.  To determine whether an area is part of the curtilage or the open fields, a court looks at four factors: (1) the proximity of the area claimed to be curtilage of the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by passers-by.  *United States v. Dunn*, 480 U.S. 294, 301 (1987).

In this case, it is undisputed that the backyard into which agents entered was directly adjacent to the apartment.  It is also undisputed that the backyard was enclosed by a high, solid wooden fence that obstructed a passerby's view and entry into the backyard.  Finally, it is undisputed that the wooden gate was closed and that a deputy had to open the gate by unlocking the latch inside the wooden gate in order to access the backyard.  There was no evidence presented concerning the nature of the uses to which the area was put.  Three of the four factors of the *Dunn* inquiry, however, demonstrate that the backyard was within the curtilage of Defendant's home and could not be considered the open fields.  *Compare United States v. Hatfield*, 333 F.3d 1189, 1196 (10th Cir. 2003) (holding that marijuana that was in well-defined yard behind residence, in and among several small structures close to back of house, in area that could not clearly be observed from street was located in curtilage of home); *United States v. Reilly*, 76 F.3d 1271, 1276-78 (2d Cir. 1996) (area constituted curtilage where man-made barriers, including trees deliberately planted along perimeter, hedgerows, and partially fallen fence, combined with natural markers made it immediately apparent

7

that area was private), *with United States v. Cousins*, 455 F.3d 1116, 1122 (10th Cir. 2006) (side yard area immediately adjacent to house was not within curtilage of home because side yard area was enclosed on only three sides, unenclosed side was expected path one would take to get to side yard, unenclosed side is paved sidewalk, and no steps were taken to limit access to walkway). Agents, therefore, were not free to enter the backyard without a warrant or without some recognized justification for a warrantless entry.  *See Hatfield*, 333 F.3d at 1198.

The Court recognizes that in some situations officers may walk around to the back door of a residence when attempting to conduct a "knock and talk" in an effort to contact a resident, unconnected with a search of the premises, when circumstances indicate the officers may find the resident there.  *See Alvarez v. Montgomery County*, 147 F.3d 354, 358-59 (4th Cir. 1998).  The primary cases relied upon for permitting entry into a backyard for such a "knock and talk" are distinguishable, however, as they all have in common the fact that the approach to the backyard was accessible to the general public and did not involve an obstruction like the high solid fence in this case.  *See*, *e.g.*, *United States v. Raines*, 243 F.3d 419, 421 (8th Cir. 2001) (holding that sheriff did not interfere with defendant's privacy interest when he, attempting to serve civil process, went "unimpeded to the back of [defendant's] home to contact the occupants of the residence" through 10-foot opening in makeshift fence of debris that had no barrier in front of opening); *Alvarez*, 147 F.3d at 357-59 (sign depicting an arrow pointing to backyard directed passersby to "Party In Back" and there was no indication that backyard was enclosed by high fence in effort to obstruct entry by the public); *United States v. Garcia*, 997 F.2d 1273, 1279-80 (9th Cir. 1993) ("If the front and back of a residence are readily accessible from a public place, like the driveway and parking area here, the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling."); *United States v. Daoust*, 916 F.2d 757, 758-59 (1st

8

Cir. 1990) (permissible for police to go to backyard to interview resident where front door was inaccessible, but there was no evidence that backyard was enclosed by fence or other obstruction); *United States v. Anderson*, 552 F.2d 1296, 1298-1300 (8th Cir. 1977) (holding that agents permissibly entered backyard after knocking on front door and receiving no response when they saw light from house and heard dog barking and believed owner might be with dog, but there was no indication that backyard was enclosed by fence).

In contrast to these cases, here Defendant had taken steps to create a reasonable expectation of privacy in the backyard by fencing off the area from the public with a solid wooden fence and gate that obstructed entry and visibility.  The Tenth Circuit has forbidden physical invasion of a home's curtilage where that curtilage is clearly defined and the residents had made efforts to limit access to the area.  *See Hatfield*, 333 F.3d at 1190, 1198 ("knock and talk" case in which court noted that officer cannot invade well-defined curtilage).  Accordingly, agents needed either a warrant or probable cause plus exigent circumstances before they could enter into the backyard through the wooden gate.

This Court ruled in its Amended Memorandum Opinion and Order (Doc. 47) that the agents had probable cause to search the apartment for contraband at the time they prepared the affidavit for the search warrant.  For the same reasons explained in that opinion, the agents had probable cause to enter the home at the time they secured it, which occurred as agents were preparing the affidavit. The only remaining question is whether the agents also had exigent circumstances to justify entry into the curtilage and then home prior to the magistrate judge issuing the search warrant.

B.        **Exigent Circumstances**

Absent exigent circumstances, the threshold of the home may not reasonably be crossed without a warrant. *Payton v. New York*, 445 U.S. 573, 590 (1980). The Supreme Court has recognized several types of exigent circumstances justifying a warrantless entry: hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police officers or other persons. *United States v. Thomas*, 372 F.3d 1173, 1177 (10th Cir. 2004) (citing *Minnesota v. Olson*, 495 U.S. 91, 100 (1990)). The Government has the burden of proving exigency. *United States v. Parra*, 2 F.3d 1058, 1064 (10th Cir. 1993). Here, the Government argues that agents entered the Monroe apartment to prevent the imminent destruction of evidence.

"An exception to the warrant requirement that allows police fearing the destruction of evidence to enter the home of an unknown suspect should be (1) pursuant to clear evidence of probable cause, (2) available only for serious crimes and in circumstances where the destruction of evidence is likely, (3) limited in scope to the minimum intrusion necessary to prevent the destruction of evidence, and (4) supported by clearly defined indicators of exigency that are not subject to police manipulation or abuse." *United States v. Aquino*, 836 F.2d 1268, 1272 (10th Cir. 1988). The first and third requirements are satisfied here. As discussed *supra*, the officers had probable cause to enter the home. The evidence also showed that the officers entered, prevented Defendant from flushing the money remitter receipts down the toilet, but then refrained from any further search of the premises. Although Defendant argues that the agents seized and moved the remitter receipts prior to the issuance of the search warrant, the evidence was inconclusive on that factual issue. Rather, the evidence indicated that the agents' entry was limited in scope to the minimum intrusion necessary to prevent the destruction of evidence.

10

Nevertheless, the Government has not satisfied the second and fourth requirements. To show that the destruction of evidence was likely, the Government points to the fact that SA Perry observed Defendant retreat into the back of his residence upon observing the agents. The fatal problem with that argument is that SA Perry made that observation after he and other agents had already entered Defendant's curtilage, and thus, already invaded an area subject to Fourth Amendment protections. Consequently, the agents cannot rely on Defendant's retreat into the home to support their exigent circumstances argument because that observation occurred after they had already violated Defendant's Fourth Amendment rights. *See Hatfield*, 333 F.3d at 1198 ("Had Officer Harrold physically invaded the curtilage to make his observation, that would have constituted a search subject to the proscriptions of the Fourth Amendment."). The Court must therefore consider the facts known to the agents prior to entering the curtilage.

The only possible evidence of exigency known to the agents prior to their entry into the curtilage was that SA Howell followed Mr. Gambino-Zavala for six miles and was concerned that Mr. Gambino-Zavala may have detected his surveillance. However, SA Howell admitted that Mr. Gambino-Zavala at no time took evasive maneuvers and that everything at the apartment appeared calm prior to their entry. Moreover, SA Perry testified that neither Defendant Beltran-Lopez nor Mr. Gambino-Zavala, when they were standing together outside the apartment, acted in a manner suggesting that they were concerned about police surveillance. Finally, the evidence showed that the agents were only investigating these two men at the time of entry into the Monroe apartment and that they had no other reason to suspect that the execution of the search warrant at the Moab home or the arrest of Mr. Gambino-Zavala had tipped off Defendant Beltran-Lopez to their surveillance to where he might attempt to destroy evidence. Accordingly, at the time agents entered the curtilage of the home, where Defendant had an expectation of privacy under the Fourth Amendment, agents

did not have exigent circumstances to justify that entry without a warrant.  The entry into the curtilage, and then into the home, prior to the warrant being issued thus violated Defendant's Fourth Amendment rights.  *Cf. United States v. Zogmaister*, 90 Fed. Appx. 325, *6 (10th Cir. Feb. 26, 2004) (unpublished opinion) (concluding that government failed to carry burden to show exigency where officers, who had reason to believe drugs and gun were in room, created their own exigency by calling suspect and feigning interest in his car, walking girlfriend back to motel room, directing her to knock, failing to prevent her from entering room, and then choosing to enter room because of perceived safety threat).

### C.    Independent Source Doctrine

Although the Court concludes that agents violated Defendant's Fourth Amendment rights, that determination does not end the inquiry because, under the independent source doctrine, evidence that has been discovered by means wholly independent of any constitutional violation is admissible, notwithstanding any antecedent Fourth Amendment violation.  *United States v. Forbes*, 528 F.3d 1273, 1278 (10th Cir. 2008).  For the doctrine to apply, the government must show that the evidence was obtained by means sufficiently independent to be purged of the primary taint.  *See id.*  The government bears the burden of showing, by a preponderance of the evidence, that there was an independent source for the evidence.  *Id.* at 1279.

The case of *Segura v. United States*, 468 U.S. 796 (1984), is instructive on whether the tangible evidence seized here pursuant to the subsequently issued, valid search warrant needs to be suppressed.  In *Segura*, officers arrested petitioner outside his apartment and then entered the apartment to secure it while a search warrant was being obtained.  *Id.* at 800. The officers did a limited security sweep of the apartment, observing some evidence of drug activity in plain view but the officers did not disturb the items.  *Id.* at 800-01.  Due to administrative delay, officers obtained

12

a search warrant 19 hours after their initial entry.  *Id.* at 801.  The district court suppressed the evidence after ruling that there were no exigent circumstances justifying the initial entry into the apartment.  *Id.* at 801-02.

Before the Supreme Court was the question whether the evidence first discovered by the agents the day after the entry under the valid search warrant should have been suppressed.  *Id.* at 804.  The Supreme Court held that "the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as 'fruit' of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence. . . ."  *Id.* at 799.

The Supreme Court in *Murray v. United States* was faced with the issue, left open in *Segura*, of whether, again assuming evidence obtained pursuant to an independently obtained search warrant, the portion of such evidence that had been observed in plain view at the time of the prior illegal entry must be suppressed.  *Murray v. United States*, 487 U.S. 533, 535 (1988).  The Supreme Court held that the independent-source doctrine should apply to allow the admission of evidence observed in plain view during an unlawful entry so long as the later, lawful seizure was genuinely independent of the earlier, tainted entry.  *See id.* at 541-42.  The Court noted that the search pursuant to the warrant is only genuinely based on an independent source if the officer's decision to seek the warrant was not prompted by what they had seen during the initial entry, and the information obtained during the entry was not presented to the magistrate judge and did not affect his decision to issue the warrant.  *See id.* at 542.  The purpose behind the independent source doctrine is that, although the police should not benefit from their unlawful conduct, neither should they be placed in a worse position by excluding evidence that was later discovered or re-seized by independent

legal means.  *See id.* at 537, 542.

In this case, the evidence shows that the agents were already in the process of securing the search warrant when they entered Defendant's residence.  The agent's decision to seek the warrant thus did not result from what they had seen or seized during the unlawful search.  Nor was any illegally obtained evidence the basis for the magistrate judge's decision to issue the search warrant. Consequently, the tangible evidence observed during the agents' initial unlawful entry need not be suppressed because it would have been obtained by independent legal means.  This tangible evidence includes the money remitter receipts.  As discussed *supra*, there is no conclusive proof before the Court that the receipts were unlawfully moved or searched during the illegal entry in a way that warrants their suppression.  Instead, the evidence demonstrates that the agents would have discovered the receipts through independent legal means.

The United States, however, has not shown that the agents' observation of Defendant attempting to flush the receipts down the toilet was sufficiently independent of the unlawful entry to justify its admission under the independent source doctrine.  Arguably, the agents may have witnessed the same action by Defendant had they waited to have a search warrant in hand, but that is pure speculation.  Defendant just as conceivably may have acted differently had agents had a warrant at the time they entered the premises.  Because the Government has not met its burden to demonstrate that Defendant's acts of retreating and attempting to destroy evidence in the bathroom would have been inevitably discovered through independent, lawful means, the Court will suppress admission of that evidence at trial.  The Court, however, will deny Defendant's request to suppress all other evidence discovered in the residence pursuant to the valid search warrant.

**IT IS THEREFORE ORDERED** that Defendant's motion to be suppress (**Doc. 28**) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Defendant's request to suppress the evidence of his retreating and attempting to destroy evidence at the time agents initially encountered him in the apartment is **GRANTED**; and

2.      Defendant's request to suppress all other tangible items discovered in the apartment, including the money remitter receipts, as a result of the search executed after the magistrate judge issued the warrant to search is **DENIED**.


_____
SENIOR UNITED STATES DISTRICT JUDGE